Mark L. Smith (Bar No. 213829)
    msmith@bakermarquart.com.com
Christian A. Anstett (Bar No. 240179)
    canstett@bakermarquart.com.com
BAKER MARQUART LLP
10990 Wilshire Boulevard, Fourth Floor
Los Angeles, California 90024
Telephone:  (424) 652-7800
Facsimile:  (424) 652-7850

Attorneys for Plaintiffs
InfoStream Group, Inc. d/b/a SeekingArrangement.com and
WhatsYourPrice.com, and Lead Wey

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| INFOSTREAM GROUP, INC. d/b/a SeekingArrangement.com and WhatsYourPrice.com, a Nevada corporation, and Lead Wey, an individual,<br><br>    Plaintiffs,<br><br>    vs.<br><br>PAYPAL, INC. a Delaware Corporation,<br><br>    Defendant. | Case No. 5:12-CV-00748-HRL<br><br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1) **VIOLATION OF THE SHERMAN ACT, SECTION TWO**<br>2) **BREACH OF CONTRACT**<br>3) **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>4) **FRAUD**<br>5) **UNFAIR BUSINESS PRACTICES** |

1      Plaintiffs InfoStream Group, Inc. ("InfoStream") d/b/a SeekingArrangement.com and

2  WhatsYourPrice.com (collectively the "Dating Websites") and Lead Wey (" Wey") (collectively

3  "Plaintiffs") bring this First Amended Complaint against Defendants PayPal, Inc. ("PayPal"), and

4  DOES 1-10 (collectively, "Defendants"), alleging as follows:

5

<b><u>Introductory Statement</u></b>

6     1.     This lawsuit arises out of PayPal's anticompetitive conduct and breach of its

7  contracts with Plaintiffs. PayPal claims it terminated Plaintiffs' accounts because of a purported

8  breach of its Acceptable Use Policy which prohibits using PayPal to process transactions

9  involving "certain sexually oriented materials or services." PayPal claimed that Plaintiffs'

10  specialty dating websites violated this provision. PayPal's termination of Plaintiffs' account was a

11  clear breach of contract, because the phrase "certain sexually oriented services" does not and

12  cannot include specialty dating websites of the kind operated by Plaintiffs. This is clearly the

13  case, because other websites that compete directly with Plaintiffs and provide and promote *exactly*

14  the kind of dating services as Plaintiffs websites to this day continue to process (and openly

15  advertise their ability to process) payments using PayPal. These competing specialty dating

16  websites operate under and are subject to the exact same User Agreement with PayPal and the

17  *exact same* Acceptable Use Policy agreement as plaintiffs. Because Plaintiffs' dating services did

18  not violate the Acceptable Use Policy, PayPal's termination breached its contract with Plaintiffs.

19     2.     This is not simply a case of sloppy enforcement of policy by PayPal. During the

20  course of trying to resolve his issues with PayPal, Plaintiff Wey explicitly pointed out the inherent

21  contradiction and unfairness in PayPal's termination of Plaintiffs' accounts while allowing

22  Plaintiffs' direct competitors to continue to use PayPal. PayPal refused to answer Wey's

23  reasonable questions and has to this day refused to terminate the accounts of Plaintiffs'

24  competitors in direct contradiction to PayPal's claimed interpretation of its Acceptable Use Policy.

25  In truth, the Acceptable Use policy has nothing to do with the real reason PayPal terminated

26  Plaintiffs' accounts. Inconsistent interpretation and application of PayPal's Acceptable Use Policy

27  is a disguise for PayPal's anticompetitive behavior.

28

1    3.    PayPal engages in anticompetitive behavior by using its market power to form

2    economic relationships with specific entities in the specialty online dating market to confer an

3    unfair advantage on PayPal's preferred specialty online dating entities.  PayPal's selective

4    enforcement and interpretation of its Acceptable Use policy gives PayPal's preferred specialty

5    dating websites a leg-up on their competition and benefits PayPal in revenue and market power in

6    its own market as detailed below.

7    4.    None of the reasons PayPal provided for the termination of Plaintiffs' accounts and

8    Plaintiffs' alleged violation of the Acceptable Use Policy provide any bases for PayPal's

9    unwillingness to work with Plaintiffs.  PayPal provided and provides payment processing services

10   to Plaintiffs' competitors.  These competitor websites prominently and publicly advertise their

11   ability to accept PayPal as a method of payment for membership.  Plaintiffs were entitled to rely

12   on PayPal's provision of services to these competitor dating websites in entering their contract

13   with PayPal, and PayPal's Acceptable Use policy must be interpreted and defined in light of its

14   application to these competitor websites.  It is clear that the provision of a dating service that

15   allows adult members to meet for purposes of having sex is simply not a violation of PayPal's

16   Acceptable Use policy and not proper grounds for the termination of a PayPal account.

17   5.    Because of PayPal's market share and preferred status with consumers for online

18   processing services, PayPal's refusal to provide services for certain dating websites drives an

19   extremely large number of consumers away from Dating Websites to use PayPal to purchase

20   accounts with its competitors that are PayPal's preferred specialty online dating vendors – namely,

21   AshleyMadison.com.com, EstablishedMen.com, ArrangementFinders.com, and

22   Arrangementseekers.com[1] (collectively the "Competitor Websites").  Plaintiffs routinely receive

23   emails from potential customers requesting that the Dating Websites accept PayPal as a method of

24

25   [1] Due to a recent settlement of a trademark dispute claim brought by Plaintiff against Avid Life Media, the owner of ArrangementSeekers.com, ArrangementSeekers.com will soon cease

26   operation and change its name to ArrangementFinders.com.  However, ArrangementSeekers.com operated up until 2011 and, importantly, accepted PayPal for membership payments.  For purposes

27   of clarity, references to "ArrangmentSeekers.com" refer to the entity's operations under either name.

28

1   payment and routinely lose business when they are forced to turn away these potential customers

2   because they cannot accept PayPal. The Dating Websites' inability to accommodate these

3   potential customers' preference for PayPal has impacted the rate at which the Dating Websites

4   have been able to expand their user networks and grow their businesses while at the same time

5   providing unfair competitive advantage to competing dating websites. This lawsuit seeks to

6   recover the damages caused by PayPal's inexcusable, anticompetitive policies and conduct.

7                                   **The Parties**

8       6.      Plaintiff Lead Wey is a natural person and resident of Nevada. Wey is the founder

9   and CEO of InfoStream.

10      7.      InfoStream Group, Inc. is a Nevada corporation. InfoStream is the registered

11  owner and operator of the SeekingArrangement.com and WhatsYourPrice.com websites

12  (collectively the "Dating Websites"). The Dating Websites provide premium dating services for

13  adults over eighteen (18) years of age.

14      8.      Defendant PayPal, Inc. is a Delaware corporation with its headquarters in San Jose,

15  California. On information and belief, PayPal is a wholly owned subsidiary of eBay, Inc.

16      9.      The true names and capacities of the defendants named herein as DOES 1 through

17  10 inclusive are unknown to Plaintiffs at this time, which therefore sues defendants by such

18  fictitious names. Plaintiffs will ask leave of this Court to amend this Complaint to insert the true

19  names and capacities of such fictitiously-named defendants when they have been ascertained.

20  Plaintiffs allege on information and belief that such defendants are in some manner responsible for

21  the damages hereinafter alleged.

22                              **Jurisdiction and Venue**

23      10.     Jurisdiction and venue are proper as all parties consented to venue and jurisdiction

24  in the state of California, county of Santa Clara as the mandatory forum to enforce or interpret the

25  operative agreements that form part of the basis of this action. In particular, PayPal's User

26  Agreement contains a forum selection clause mandating venue within Santa Clara County,

27  California. *See* Ex. 1 ¶ 14.3. Additionally, Defendant's User Agreement provides that California

28  law governs the Agreement "without regard to conflict of law provisions." *Id.*

1          **Factual Allegations Common to All Counts**

2      **A.**     **PayPal's Business**

3         11.     Defendant PayPal is an e-commerce business that allows payments and money

4 transfers to be made through the Internet. PayPal performs online payment processing for

5 websites, online vendors, auction sites, subscription services and other commercial users for which

6 it charges a fee. PayPal affords individuals and businesses the ability to accept payment for goods

7 and services sold online.

8         12.     PayPal users link their bank account, debit card, or credit card so that their

9 payments can be funded. According to PayPal, this information is never shared with retailers. It's

10 securely protected by data encryption technology, reducing the risk of online fraud and identity

11 theft. PayPal then reports transactions by only transaction number. PayPal is the world's largest

12 provider of this kind of "Confidential Payment Service."

13         13.     PayPal operates in 190 markets, 17 local languages, and transacts in 19 currencies.

14 PayPal operates with 27 global financial networks and 15,000 local banks around the world.

15 Concerning PayPal's global capabilities, Scott Thompson, former president of PayPal and now

16 CEO of Yahoo Inc. said, "Google doesn't have it. Amazon doesn't. The banks don't have it. Only

17 PayPal." According to a survey results released by December 2005 by SG Cowen & Co., 91% of

18 online Americans already owned a PayPal account and another 4% planned to open one during the

19 next year.

20         14.     On October 3, 2002, PayPal became a wholly owned subsidiary of EBay, an online

21 auction and shopping website in which people and businesses buy and sell a broad variety of

22 goods and services worldwide.

23         15.     In order to maintain a PayPal account, a user must agree to the PayPal User

24 Agreement, a contract between the user and PayPal. PayPal's User Agreement notes that PayPal

25 may "close, suspend or limit your access to your Account or the PayPal Services" for violations of

26 the PayPal Acceptable Use Policy.

27

28

1    16.    PayPal drafted both the PayPal User Agreement and the Acceptable Use Policy.
2  The agreements are adhesive contracts, as PayPal offers its services on a "take it or leave it" basis
3  without giving consumers opportunities to negotiate terms to benefit their interests.

4    17.    The PayPal Acceptable Use policy prohibits certain activities.  Among other things,
5  the Policy prevents the use of PayPal services for "certain sexually oriented materials or services."
6  The phrase "certain sexually oriented materials or services" is ambiguous.  The phrase means that
7  only some subset of "sexually oriented materials or services" (i.e. only "certain" sexually oriented
8  materials) but does not define or otherwise illustrate which sexually oriented materials are
9  prohibited by the policy and which are permissible.  It is, in fact, impossible to know from the text
10  alone of the Acceptable Use Policy itself what "sexually oriented services" comply with PayPal's
11  purported policy and which do not.  On information and belief, PayPal built this ambiguity into
12  the Acceptable Use Policy in order to allow it to favor businesses affiliated with PayPal while
13  discriminating against their competitors.

14    18.    However, in practice it was clear that PayPal's Acceptable Use Policy did not
15  prohibit "sugar daddy" dating practices and services and these services were not the "certain
16  sexually oriented materials" referenced in the Acceptable Use Policy.  As discussed below, PayPal
17  processes payments for a number of competing dating websites, including AshleyMadison.com,
18  that openly advertise and promote sugar daddy dating and dating where people meet for purposes
19  of having sex.  PayPal's actions conclusively demonstrate that "sugar daddy dating" does not fall
20  within the prohibitions of the Acceptable Use Policy.

21    **B.    InfoStream's Business**

22    19.    InfoStream owns and operates a number of dating websites, including
23  SeekingArrangement.com and WhatsYourPrice.com.  These websites facilitate dating between
24  adults over the age of eighteen (18).

25    20.    SeekingArrangement.com was launched in 2006 and promotes mutually beneficial
26  relationships between members who are referred to as either sugar daddy, sugar mommy or sugar
27  baby users.  According to SeekingArrangement.com's policy, users must be over eighteen (18)
28  years of age to use the website.  In addition, the website maintains a strict no-nudity policy.  Like

1   many other dating websites, SeekingArrangement.com sometimes advertises its services to

2   married men.  Seekingarrangement.com charges members a fee for access to the site.  Through the

3   site, users can search for others interested in forming mutually beneficial relationships while

4   retaining some degree of anonymity.

5          21.     WhatsYourPrice.com is an online dating website and marketplace established in

6   March 2011 that allows members to buy and sell the opportunity of going out on a first date.  The

7   website uses a proprietary technology to allow single adults to negotiate and agree on a price for a

8   first date.  Facilitating this negotiation helps single adults meet other single adults they really want

9   to meet.  The concept is a natural extension of the familiar practice of buying a first date at a

10  charity event where prominent men and women offer themselves to be auctioned off as dates.  The

11  website maintains a strict no-nudity policy.  The website includes a section that explaining the

12  ingredients of a good date and proposes 20 first date ideas that include sky diving, karaoke, and a

13  trip to the driving range.  WhatsYourPrice.com charges users for membership to the site.

14         22.     Although the Dating Websites cater to adults looking for a nontraditional dating

15  experience, the Dating Websites do not promote, facilitate or approve of illegal conduct between

16  members.  The user agreements for the Dating Websites specifically prohibit the use of the dating

17  services for <u>any</u> commercial or illegal use.  For example, the user agreement for

18  SeekingArrangement.com contains a "Non Commercial Use by Members" clause which states:

19

20          SeekingArrangement.com is for the personal use of individual Members only and
            may not be used in connection with any commercial endeavors.  Organizations,
            companies, agencies, and/or businesses may not become Members and should not
21          use the Service or the Website for any purpose. Illegal and /or unauthorized uses of
            the Website ... will be investigated, and appropriate legal action will be taken,
22          including without limitation, civil, criminal and injunctive redress.

23  SeekingArrangement User Agreement § 13, http://www.seekingarrangement.com/terms.php.  The

24  "Acceptable Website Use" provision further provides that members may not use the website to

25  "transmit, distribute, store or destroy material (i) in violation of any applicable law or regulation

26  ... or in a manner that is defamatory, <u>obscene</u>, threatening, abusive or hateful." Id.

27  WhatsYourPrice.com's user agreement contains identical provisions.

28  http://www.whatsyourprice.com/terms.

23.     The Dating Websites' prohibition of illegal conduct extends to prostitution. The Dating Websites promote mutually beneficial, consensual relationships among adults of differing economic and experiential backgrounds -- they are not escort services or affiliated with escort services. To the contrary, the terms of the user agreements forbid any use of the Dating Websites or dating services for the promotion of escort services or prostitution. SeekingArrangement.com specifically addresses the issue in its "Frequently Asked Questions" section of the website:

> **5. Can I Advertise my services (e.g. escort, dating services)??**
>
> No. You may not advertise your services on SeekingArrangement.com. Anyone caught doing so, will have their account cancelled and will be banned from using our website. Please do not advertise your dating services or escort services on our website. Advertising such services violates our User Agreement, and as such you may be accessing our website without authorization or permission from us … we reserve the right to seek legal action against you.

The Dating Websites strictly enforce this policy and delete user accounts used to promote or advertise escort services.

### C.     PayPal's Anticompetitive Behavior

#### 1.     Market Power

24.     PayPal operates in various markets. For example, PayPal has roughly 80% market share of payment processing for eBay purchases in the United States. PayPal also has a more than 15% market share of all online transactions, which includes all methods of payment, and is expected to meet or exceed 24% market share in this market by the end of 2012.

25.     PayPal has market power in the online payment services market and a monopoly in the "Confidential Payment Services" market. There is a distinct relevant market for confidential online payment services that do not require financial information to be revealed to the seller and that identify reported transactions only by a transaction number. The Confidential Payment Services market currently includes Google Checkout, Moneycard, and Wirebookers, and PayPal. Other payment types, including credit cards, are not functional equivalents in this market. Indeed, Plaintiffs accept other forms of payment but have been harmed by their inability to use PayPal while their competitors are permitted to do so.

26.     PayPal has a monopoly in this market with a growing market share already well in excess of 50% and likely exceeding 75%.  This market share has been both sustained and growing for at least ten years.

27.     Former president Scott Thompson put it best when he told analysts that PayPal is a market-leader in transactions, "No one comes close – not the banks, not the telecos and not the startups".

### 2.     Barriers to Entry

28.     There are a small number of participants in this market, and the market has high barriers to entry.  For example, competitors like Citibank's c2it, Yahoo's PayDirect, and Western Union's BidPay all attempted to compete in this market and failed, exiting the market in 2003, 2005, and 2007, respectively.

29.     Google's experience attempting to enter the market is particularly telling.  Like Citibank, Yahoo, and Western Union, Google attempted to enter with market with high brand recognition and visibility and as a highly sophisticated and experienced potential competitor in online transactions.  In fact, Google is the fourth ranked brand in the world in terms of brand awareness.  Yet, Google was not able to penetrate PayPal's market dominance.

30.     According to a 2007 *Compete Pulse* article, "Google has aggressively tried to buy its way into the market dominated by eBay's PayPal service since launching last summer. Google recently reported spending nearly $60 million at the end of [2006] to promote Checkout." Google spent that sixty million marketing Checkout and offering coupons.  Google also waived processing fees for transactions.  Notwithstanding its brand recognition, significant financial investment, and operating at a loss by not charging any fees just to attempt to penetrate the market, after nearly a year of competing with PayPal, Google had less than a 1% market share.  Barriers to entry are raised even higher here because one of the largest online marketplaces in the world, eBay, owns PayPal and protects PayPal's market share by banning Confidential Payment Services from use on its site.  For example, in 2006, eBay banned the use of Google checkout from use on eBay.

1

### 3.   Anticompetitive Conduct and Injury to Competition

2      31.   PayPal has injured competition in the downstream market in which Plaintiffs
3 compete through the discriminatory use of its market power as a monopolist. As described below,
4 PayPal has engaged in and engages in predatory or anticompetitive conduct directed at
5 accomplishing its unlawful goal of harming competition downstream for its benefit. Because of
6 PayPal's improper wielding of its market power, the downstream Specialty Online Dating Site
7 market is threatened and actually injured, market participants against whom PayPal discriminates
8 are threatened and injured, and ultimate consumers are harmed.

9      32.   PayPal wields its market power discriminatorily by giving some market
10 participants in downstream markets access to its services and denying access to others. Plaintiffs
11 compete in downstream market for "Specialty Online Dating Sites," which is defined for purposes
12 of this action as the online dating sites that seek to introduce men and women of disparate
13 financial conditions and includes market participants such as the Competitor Websites, the Dating
14 Websites, and other websites. This is one of several markets that have been injured through
15 PayPal's improper use of market power, injuring Plaintiffs and giving them standing to bring
16 antitrust claims.

17      33.   In the Specialty Online Dating Sites market, PayPal uses inconsistent interpretation
18 and application of its Acceptable Use Policy as its basis for discriminating and to attempt to
19 conceal its illegitimate use of market power, thereby injuring competition in the downstream
20 market. Additionally, notwithstanding the fact that PayPal is a monopolist, PayPal refuses to deal
21 with certain consumers of its products and services, including Plaintiffs, that it believes do not
22 warrant expedient abandonment of its Acceptable Use Policy.

23      34.   PayPal may have reputational and business justifications for having its Acceptable
24 Use Policy. It, however, does not enforce that policy when it stands to gain significantly by
25 ignoring the policy and allowing access to a vendor with significant volume purchases like
26 AshleyMadison.com. As a monopolist, its discriminatory application to low-volume vendors is
27 anticompetitive, injuring competition in downstream markets and ultimately consumers.

28

1    35.    Plaintiffs are denied access to the Confidential Payment Services market that

2  PayPal dominates while Competitor Websites are not.  This has resulted in diminution of

3  Plaintiffs' competitive position in its Specialty Online Dating Site market.  Plaintiffs simply

4  cannot compete at the level that Competitor Websites compete without having access to PayPal's

5  services.

6    36.    Competition in the downstream market is reduced as PayPal effectively chooses

7  market winners and puts those market winners in a position to have market power or be

8  monopolists themselves.  In the Specialty Online Dating Site market, PayPal's actions have

9  created market power for competitors like ArrangementSeekers.com and for AshleyMadison.com

10  and have driven many of their competitors out of the market.  Thus, PayPal has created a Specialty

11  Online Dating Site market with fewer choices, diminished pricing competition, and inferior

12  products to ultimate consumers due to less competition.

13    37.    Finally, PayPal's market power and monopoly in the Confidential Payment

14  Services market has allowed it to extract super-competitive premiums from its customers by not

15  being required to compete on price as the Google example demonstrates.  PayPal's market power

16  and monopoly have also created inferior product markets for consumers in its own market and in

17  downstream markets.

18              **4.    Specific Intent and Concerted Action**

19    38.    PayPal has specific intent to control prices or destroy competition in the relevant

20  Specialty Online Dating Site market.  PayPal manipulates the downstream markets for its own

21  benefit.  As described above, it chooses market winners in downstream markets with the intent to

22  benefit itself by increasing revenue and in maintenance of its market power in the Confidential

23  Payment Services market.  PayPal profits from having arrangements with dominant downstream

24  parties because it ensures it will receive the revenue from the party it has helped gain dominant

25  downstream market share.  And PayPal maintains and even increases its monopoly by creating

26  downstream arrangements, like the one it has with AshleyMadison.com, that do not offer the

27  services of its competitors and promote its services.  In exchange, it need only withhold access to

28  its services from AshleyMadison.com's competitors.

1    39.    PayPal also has contractual arrangements with Competitor Websites from which it
2  benefits from increased exposure among their users, which, particularly in the case of the latter,
3  are very numerous, and an incredibly high volume of business directed toward PayPal.  A non-
4  discriminatory application of PayPal's Acceptable Use Policy would result in PayPal losing this
5  significant volume of transactions.

6    40.    For these reasons, the arrangements PayPal has with Competitor Websites are
7  concerted refusals to deal with Plaintiffs.  Accordingly, these arrangements are per se
8  anticompetitive in nature.

9    **D.    PayPal Discriminates Against Plaintiffs' Websites**

10    41.    In 2007, Plaintiff Wey set-up a PayPal account associated with the email address
11  lead@InfoStreamgroup.com.  This account was used to accept payments for upgrades and
12  subscriptions for the SeekingArrangement.com.  PayPal's Acceptable Use Policy Group, however,
13  suspended this account in or around 2007 for violation of PayPal's Acceptable Use Policy.  At the
14  time of the suspension, PayPal informed Plaintiffs that it could not process payments on behalf of
15  SeekingArrangement.com because of the "sexual" nature of the website, even after Plaintiffs made
16  clear that there was no adult content allowed on the website.  After Plaintiffs agreed to stop using
17  this PayPal account to accept payments for SeekingArrangement.com, the
18  lead@inforstreamgroup.com account was re-activated and Plaintiffs used the account for other
19  online business ventures.  As discussed below, contrary to the reasons provided by PayPal for the
20  termination of Plaintiff's account, Seekingarrangement.com did not actually violate the
21  Acceptable Use Policy.  Rather, PayPal offered this explanation of the termination as a pretext to
22  disguise its real reason for terminating SeekingArrangement.com's account – to economically
23  benefit competitor sites.

24    42.    PayPal's pretextual termination of SeekingArrangement.com's account caused the
25  Website significant economic damage in terms of lost customers and business.  Because of
26  PayPal's reputation and dominance in the online-transaction processing market, potential
27  customers of Seekingarrangement.com often specifically conditioned their joining the site on its
28  acceptance of PayPal as a method of payment.  PayPal's unjustified termination of the account

1  slowed SeekingArrangement.com's ability to grow and add customers and, considering that, like

2  any social networking site, the number of users of a site increases the rate at which the site

3  expands and grows, cost SeekingArrangement.com a significant amount of foregone revenue.

4      43.    In or around March 29, 2011, Plaintiffs launched the WhatsYourPrice.com website.

5  In connection with the launch of the website, Plaintiffs established a PayPal account associated

6  with the email address brandlead@gmail.com for purposes of processing payments.

7      44.    During the process of setting up the account, Plaintiff and PayPal entered into the

8  PayPal User Agreement, which describes itself as a "contract between you [the online vendor] and

9  PayPal." PayPal User Agreement Preamble. Ex. 1. Pursuant to the User Agreement, PayPal

10 agreed to process transactions for WhatsYourPrice.com. Implicit in this Agreement was PayPal's

11 duty to provide its processing services to WhatsYourPrice.com in good faith and not take actions

12 that unfairly favored WhatsYourPrice.com's competitors. Plaintiff's decision and understanding

13 of the terms of PayPal's User Agreement and Acceptable Use policy were at all times based on the

14 text of those agreements and also on PayPal's treatment of competing dating websites.

15     45.    Despite its agreement to provide processing services to WhatsYourPrice.com, on

16 April 14, 2011, PayPal permanently suspended the brandlead@gmail.com and two other accounts

17 associated with InfoStream Group e-mail addresses (even though those accounts were not used to

18 process payments from SeekingArrangement.com or WhatsYourPrice.com).

19     46.    PayPal claimed that it terminated the accounts because it determined that

20 WhatsYourPrice.com was in violation of PayPal's acceptable use policy. PayPal provided a

21 number of different and inconsistent reasons for the termination of Plaintiff's account. All of the

22 explanations, however, focused on the sexual nature of the dating service provided by the Dating

23 Websites'. In a April 29, 2011 email to Wey, a PayPal employee stated that Plaintiffs' PayPal

24 accounts were terminated for violation of PayPal's Acceptable Use Policy because: "Two of the

25 options for daters to choose from are 'Dating – Casual / Intimate Encounter' & Married Dating /

26 Discreet Affair' (meeting for purposes of having sex." In a May 10, 2011 email, a different

27 PayPal employee forwarded an email that stated that Plaintiffs' accounts were terminated because

28 "Under the Acceptable Use Policy, PayPal may not be used to send or receive payments for

1 certain sexually oriented materials or services or for items that are considered obscene." In a

2 phone conversation with Wey in May of 2011, a PayPal representative stated that the emphasis on

3 monetary exchange between members of the Dating Websites' prevented PayPal from processing

4 payments on their behalf (an especially ironic justification for termination, given that PayPal's

5 parent company eBay's entire existence depends on economic exchanges between its members).

6     47.     Plaintiff Wey engaged in extensive efforts to resolve the issue with PayPal and

7 spent countless emailing and calling PayPal to find out: why his accounts had been cancelled, how

8 he could modify the Dating Websites so as to bring them in compliance with the Acceptable Use

9 Policy, and also asking PayPal to explain how other dating websites providing identical services to

10 the Dating Websites were allowed to maintain PayPal accounts for processing customer

11 membership payments. Plaintiff also asked PayPal to reconsider its decision to terminate his

12 accounts.

13     48.     Some PayPal employees gave Plaintiffs the impression that dispute could be

14 resolved or PayPal's decision re-considered or Plaintiffs' websites modified to come into

15 compliance with the Acceptable Use Policy. For example, on or about May 9, 2011, Wey

16 received a phone call from Ashley Bates, a Program Manager of Brand Risk Management at

17 PayPal. Bates discussed PayPal's issues with the websites at length. Bates ended the conversation

18 by stating that she would have a PayPal sales person contact Wey to approve him for a merchant

19 account and would work on un-suspending his other accounts.

20     49.     On May 10, 2011, Bates emailed Wey to inform him that PayPal would not be able

21 to continue processing payments for the Dating Websites. PayPal provided a number of

22 "explanations" for its decision to terminate Plaintiffs' accounts, usually disguising the real reason

23 for the termination by citing the Acceptable Use policy. On May 3, 2011, Julie Bainbridge stated

24 that the Dating Websites violated PayPal's Acceptable Use Policy: "As mentioned below—two of

25 the options for daters to choose from are 'Adult Dating – Casual / Intimate Encounter" and

26 "Married Dating / Discreet Affair (meeting for the purpose of having sex). This would fall under

27 the adult category." Bainbridge's first explanation for the termination of the accounts did not

28 reference "monetary exchange" between members or a faux concern for escorts.

50.     Of course, however, PayPal does process payments for Ashley Madison – the website that bills itself as the premiere website for "Married/Discreet Affair" dating and "meeting for the purposes of having sex." Because of this, on information and belief, after Wey continued to press PayPal to explain its decision, PayPal had to make up new excuses for why it favored Ashley Madison. Plaintiff Wey expressly complained to PayPal concerning the disparate treatment PayPal bestowed upon his direct competitors and prejudicial application of its Acceptable Use policy. On May 9, 2011, in an email to Julie Bainbridge at PayPal, Wey noted that: "The fact is other competitors of mine were pre-approved by PayPal, so obviously I should be able to … [get] my websites to get them pre-approved as well."

51.     On May 10, 2011, Ashley Bates stated in an email that: "Under the Acceptable Use policy, PayPal may not be used to send or receive payments for certain sexually oriented materials or services or for items that are considered obscene." During a phone call with Plaintiff Wey that also took place on May 10, 2011, Bates explained that there was no possible way that Wey could modify the Dating Websites to bring them into compliance with the Acceptable Use policy, because both sites "promote monetary exchange between members" and modifying the website or changing its language would not "change the customer base." Nothing in the PayPal Acceptable Use policy mentions the "promotion of monetary exchange" between members – and PayPal and eBay's entire businesses seem built on the promotion of monetary exchange between their members. And it cannot be the exchange of money for sex because that is expressly forbidden and policed on Dating Websites.

52.     After weeks of stringing Plaintiffs along and providing numerous contradictory explanations for the termination, PayPal ultimately refused to reconsider the termination of the accounts or explain how Plaintiffs could bring the websites in compliance with PayPal's Acceptable Use Policy and flatly stated that, due to the nature of the Dating Websites, it could not provide processing services to them under any conditions.

53.     PayPal did not terminate or suspend Plaintiffs' accounts because of any violation of PayPal's acceptable use policy. It could not be the case that PayPal terminated Plaintiff's accounts because of the nature of the services provided on Plaintiff's website, because PayPal has and

1   continues to process payments for websites in direct competition with the Dating Websites that

2   provide identical services PayPal cited as violations of its Acceptable Use Policy and the cause of

3   the termination of Plaintiffs' PayPal accounts. PayPal has not discontinued or terminated its

4   accounts with these competing sites, even though they are carbon copies of Plaintiffs' websites

5   and offer similar or identical services. PayPal has also consistently refused to provide any

6   explanation whatsoever as to why the competing dating websites, in direct competition with and

7   providing identical services to the Dating Websites, did not violate the terms of PayPal's

8   Acceptable Use Policy while the Dating Websites' somehow violated that policy. On information

9   and belief, PayPal has refused to supply any explanation because there is no rational, good faith

10  explanation for PayPal's discriminatory application of its Acceptable Use policy.

11          54.     Any objection PayPal might raise about being concerned with the transactional

12  nature of Plaintiffs' dating sites and, in particular, that women may be paid to go on a date is

13  simply a sham. AshleyMadison.com and ArrangentSeekers.com have identical financial

14  possibilities available to their patrons. AshleyMadison.com, the site that PayPal champions by

15  maintaining their ongoing business relationship, recently put a $1,000,000.00 "bounty" on NFL

16  quarterback Tim Tebow. In a massive press campaign, Ashley Madison unabashedly offered a

17  $1,000,000.00 "prize" to any woman with proof of having sex with Tebow. Tebow is a devout

18  Christian who has publicly professed his intention to save his virginity for marriage. Plaintiffs'

19  specifically forbid and police any activity that would constitute paying for sex on their sites.

20  AshleyMadison.com, on the other hand, has now taken the position that not only should the

21  women on its site be paid for sex under certain circumstances but that the site itself is willing to

22  pay them for having that sex. As it stands now, that million dollar payment AshleyMadison.com

23  seeks to pay a woman to have sex with Tebow could be processed through PayPal.

24          E.      **PayPal Processes Payments for Dating Websites**

25          55.     The Competitor Websites all compete directly with the Dating Websites and

26  provide the same or similar services as the Dating Websites – including promoting the sugar

27  daddy / sugar baby dating concepts employed by the Dating Websites

28

56.     AshleyMadison.com has trademarked the slogan "Life is short. Have an affair." On the home page of its website, AshleyMadison.com advertises itself as "The world's leading married dating service for **discreet** encounters." Another of the advertising slogans prominent on AshleyMadison.com's homepage is "AFFAIRS GUARANTEED – Cheating Partners Have an Affair Married Dating." The website asks users to select their "relationship status" when joining the site. A drop-down menu provides "Attached male seeking females" and "Attached females seeking males" options. AshleyMadison.com also provides a money-back "Affair Guarantee Program." In its FAQ, AshleyMadison.com touts itself as the preeminent dating service for committing infidelity: "However, if you still feel that you will seek a person other than your partner to fill your unmet needs, then we truly believe our service is the best place to start." In fact, all of the Competitor Websites that compete directly with the Dating Websites and match members seeking mutually beneficial arrangements allow users to pay for their services with PayPal.

57.     AshleyMadison allows its users to seek and form the kind of "mutually beneficial" sugar daddy / sugar baby relationships promoted by the Dating Websites. On February 10, 2011, Bloomberg's Business Week ran a lengthy article on Ashley Madison titled "Cheating, Incorporated." That article cited an "expert," Elmislie, who suggested that the "vast number of husbands and young, unattached woman" on AshleyMadison created "a dynamic that could be exploited for prostitution." The article cited examples of AshleyMadison profiles demonstrating that many female users on the site are "looking for guys who want to take them shopping." For example, the article cited the profile of "ArtPrincess," "Single Lady from New York … seeking **ideally mutually beneficial Sugar Daddy/Sugar Baby type of LTR**" (emphasis added). The owner and CEO of Ashley Madison, Noel Biderman, responded to the profile by affirming the sugar daddy concept: "Is that different from any dating scenario? If you take a woman out and buy her a diamond ring and a Valentine's gift—that is how the world works."

58.     Amazingly, given PayPal and AshleyMadison's anticompetitive alliance that denies the Dating Websites the ability to use PayPal and compete with AshleyMadison, the BusinessWeek article actually describes Biderman's frustration at "how unfairly [AshleyMadison]

1  is treated in the marketplace." Biderman quite vocally laments the discrimination in the

2  marketplace suffered by AshleyMadison: "How many companies do you know, if they wanted

3  their own brand as a key word in a search engine like MSN, they can't even do that, can't even

4  defend their own territory?  Can't buy the word 'infidelity,' which is troubling, I think.  I think it's

5  my role in that conversation to say, hey, isn't that a problem."  PayPal, it seems, is one of the few

6  commercial entities that is willing to provide its services to AshleyMadison.com, but ironically

7  refuses to provide those same services to its direct competitors by citing the kind of moral

8  acceptable use policies that other companies use to deny services to PayPal's client,

9  AshleyMadison.  The article also discusses a Canadian investment bank that cancelled a large

10  transactional deal involving AshleyMadison at the.last minute when a Canadian reporter handed

11  the bank's CEO a printout of a certain profile posted on Ashley Madison's website: "To be honest,

12  I'm really looking for a sugar daddy, so if that isn't you I wouldn't waste your time replying.  I'm

13  looking for a generous man that loves to take care of a younger lady, I am 18 and have just started

14  university and my parents aren't paying a cent for it ... if there is a nicer gentlemen on here that

15  really gets off on helping a young women with some bills, taking stress of her shoulders while

16  receiving the same back both emotionally and physically please message me."

17      59.   Contrary to PayPal's assertion that its Acceptable Use Policy prohibits PayPal to be

18  used in situations where sex is somehow associated with "monetary exchange,"

19  AshleyMadison.com advertises its dating services on obvious illicit escort service websites.  For

20  example, Ashley Madison advertisements have appeared on BigDoggie.net, an escort review and

21  message board, www.aussieescorts.com, Australia's self-proclaimed "Favourite Escort directory;"

22  and Cincinnati-escorts.net.

23      60.   ArrangementSeekers.com is an online dating website owned and operated by

24  "EstablishedMen, Inc."  ArrangementSeekers.com touts itself as the "#1 site where men and

25  women find discreet, mutually beneficial relationships" connecting"Young, Beautiful Women

26  with Successful Men."  On a part of its webstite titled "Arrangementseekers – Introduction to

27  Mutually Beneficial Arrangements and Financial Flings," ArrangementSeekers.com explains its

28  origins in terms of fundamental human desires: "Classy women have always desired a glamorous,

1  luxurious lifestyle – but there is often a discrepancy between a woman's big dreams and her

2  shallow pockets ... Prominent local businessmen often frequent Gentlemen's Clubs and

3  sometimes make a strong first impression, but which rarely ends up with dinner.  We knew it was

4  time to create a website with an offer that was too good to refuse."  The website uses scare quotes

5  to describe the "arrangements" between men and women that it promotes, and announces to

6  women that it "makes it easy to find a sugar daddy to pamper and spoil you."  Like the other

7  websites, ArrangementSeekers.com expressly indicates that its services may be used by married

8  men.  Like AshleyMadison.com, ArrangementSeekers.com allows users to pay for a membership

9  via PayPal.

10       61.  Arrangementfinders.com is a dating website owned and operated by

11  "EstablishedMen, Inc."  Arrangementfinders.com's homepage promotes the website as "Intimacy

12  with a Twi$t."  In the "Who We Are" section of the website, Arrangementfinders.com describes

13  itself as "an exclusive service that connects men and women looking for mutually beneficial

14  relationships."  In one of its screenshots, Arrangementfinders.com displays a picture of a female

15  member identified as a "sugar baby."  Arrangementfinders.com allows members to pay for a

16  membership with PayPal.

17       62.  Establishedmen.com's tagline is a dating website with the tagline "Where the

18  Beautiful and Successful Meet."  In its own words, "Established Men connects ambitious and

19  attractive girls with successful and generous benefactors to fulfill their lifestyle needs."  Elsewhere

20  on the site, Establishedmen.com describes itself as "the premier online dating service that connects

21  Young, Beautiful Women with Rich, Successful Men!" and "the # 1 dating site of its kind."

22  Establishmen.com's "Press and Media Enquiries" section of the website contains a link to a

23  YouTube video entitled "Sugar daddy Dating – Establishedmen.com."  That YouTube video

24  contains a ABC News story on the website.  Among other things, that news story documents a

25  date between two members of the website (who met on the website), a 26 year old aspiring actress

26  and her "generous" date, a 42 year old television producer.  The date takes place among the luxury

27  stores on Rodeo Drive, including the exclusive Jimmy Choo shoe store.  The voiceover narrator

28  remarks that, although it is only the couple's third date, the television producer has already spent

1    almost $10,000 dollars on the actress. The narrator notes that the man's expenditures are "not

2    unexpected" but are rather "a crucial step in their courtship." Establishmen.com allows members

3    to pay for memberships with PayPal.

4           63.   On information and belief, PayPal allows the Competitor Websites to maintain

5    PayPal accounts and processes the membership fees paid by users of those sites. PayPal has not

6    terminated or suspended the accounts of either website for violation of PayPal's acceptable use

7    policy. On information and belief, Plaintiffs believes that PayPal may have some direct or indirect

8    financial arrangement or ownership interest in Competitor Websites.

9           64.   While he attempted to resolve his dispute with PayPal, Plaintiff Wey asked PayPal

10   on numerous occasions why it allowed direct competitor dating websites like Ashley Madison

11   providing the same kind of service as the Dating Websites to process payments with PayPal, but

12   refused to process payments for the Dating Websites. In response to Wey's question, PayPal

13   admitted that Ashley Madison and other specialty dating websites that openly accept PayPal **have**

14   **been pre-approved by PayPal and found not to violate PayPal's Acceptable Use Policy**. On

15   May 3, 2011, PayPal employee Julie Bainbridge stated: "Dating sites require pre-approval per our

16   Acceptable Use Policy. If you find a site that accepts PayPal then you can assume that it's been

17   pre-approved." PayPal then has pre-approved and found that the specialty dating websites

18   Establishedmen.com, AshleyMadison.com and ArrangementFinders.com all comply with the

19   terms of PayPal's Acceptable Use Policy.

20          65.   In establishing his PayPal account, Plaintiff relied on the Competitor Websites'

21   open, notorious and public use of PayPal to process membership fees for their dating websites. As

22   all of these websites offered essentially identical services as the Dating Websites', Plaintiff

23   naturally understood that the services provided by the Dating Websites did not violate PayPal's

24   Acceptable Use Policy. Had the services provided by the Dating Websites violated PayPal's

25   Acceptable Use policy, then the Competitor Websites would not have been able to openly and

26   notoriously use PayPal as a third party processor for their transactions. Plaintiff, however, failed

27   to grasp PayPal's real acceptable use policy. PayPal's real Acceptable Use "policy" was to

28

1  selectively enforce the vague terms of its written Acceptable Use policy in order to bestow an

2  unfair competitive advantage on certain dating websites and not others.

3        66. PayPal's unjustified and disparate treatment of the Dating Websites and the

4  Competitor Websites has provided the Competitor Websites with an unfair commercial advantage

5  vis-a-vie the Dating Websites. The ability to accept PayPal as a method of payment for

6  membership provides the Competitor Websites with an unfair competitive advantage over the

7  Dating Websites and has by itself caused customers to purchase memberships in the Competitor

8  Websits instead of the Dating Websites.

9      **F.**    **PayPal Cannot Explain the Disparate Treatment of the Dating Websites**

10        67. After having his accounts terminated, Plaintiff Wey asked PayPal to explain how

11  the dating websites AshleyMadison.com and ArrangementSeekers.com were allowed to maintain

12  PayPal accounts and comply with PayPal's Acceptable Use Policies, whereas the Dating Websites

13  had their PayPal accounts terminated and were deemed in violation of PayPal's Acceptable Use

14  Policy – even though they provided functionally identical services. PayPal has never attempted to

15  explain the reason for the disparate treatment of the websites or provide reasons why some dating

16  websites that promote economic exchange between members or cater to married individuals

17  violate its Acceptable Use Policy while other dating websites involved in the same activities do

18  not. PayPal has not provided Plaintiffs with such an explanation because indeed there could be no

19  logical or rational explanation for the treatment, other than PayPal's advancement of its own

20  financial interests. PayPal uses its Acceptable Use Policy as a pretext for discriminating against

21  the Dating Websites in order to provide AshleyMadison.com and ArrangementSeekers.com with

22  an unfair competitive advantage. PayPal's inability to articulate to any kind of coherent or logical

23  treatment for its disparate treatment at any point during Lead's attempts to work with PayPal to

24  maintain Plaintiffs' accounts is implicit acknowledgement by PayPal that no such logical

25  explanation of its conduct exists. After stringing Plaintiffs along through PayPal's convoluted and

26  intentionally ineffectual and mysterious "resolution process," PayPal ultimately refused to provide

27  accounts to Plaintiffs for <u>any</u> purpose and told him to "look for another payment processor."

28

# FIRST CAUSE OF ACTION

## (VIOLATION OF THE SHERMAN ACT, SECTION TWO)

68.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

69.    Plaintiff has market power and, in fact, a monopoly in the Confidential Payment Service market. Section Two of the Sherman Act applies to conduct that threatens harm to the competitive process, whether that harm occurs upstream or downstream. PayPal has exercised its market power in the Confidential Payment Service market to injure competition in downstream markets, including the Specialty Online Dating Services market.

70.    PayPal has specific intent to control prices or destroy competition in the relevant Specialty Online Dating Site market. PayPal manipulates the downstream markets for its own benefit. It chooses market winners in downstream markets with the intent to benefit itself by increasing revenue and in maintenance of its market power in the Confidential Payment Services market.

71.    The arrangements PayPal has with AshleyMadison.com and ArrangementSeekers.com are concerted refusals to deal with Plaintiffs. Accordingly, these arrangements are per se anticompetitive in nature.

72.    PayPal has engaged in and engages in predatory or anticompetitive conduct directed at accomplishing its unlawful goal of harming competition downstream for its benefit. It does this by foreclosing downstream competition by permitting only certain market participants access to the Confidential Payment Service market it dominates and monopolizes.

73.    The result of PayPal's anticompetitive conduct is that the Specialty Online Dating Sites market is harmed. PayPal's acts have driven many of competitors out of the market and has created a Specialty Online Dating Site market with fewer choices, diminished pricing competition, and inferior products to ultimate consumers due to decreased competition.

74.    As a result of PayPal's acts in this regard, Plaintiffs have been injured in an amount to be determined at trial. Plaintiffs are also entitled to have those damages trebled and to injunctive relief.

## SECOND CAUSE OF ACTION

### (BREACH OF CONTRACT)

75.     Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

76.     Plaintiffs entered into a contract with PayPal wherein PayPal agreed to provide payment processing services for Plaintiffs' websites in exchange for various fees.

77.     Despite their contract, PayPal terminated Plaintiffs' accounts, refused to provide further processing services for Plaintiffs, and instructed Plaintiffs to look for other payment processors.

78.     Plaintiffs have at all times performed all duties and obligations under the contract, except to the extent that Plaintiffs were excused or prevented from doing so by the acts and omissions of PayPal.

79.     As a direct and proximate result of PayPal's breach of contract with Plaintiffs, Plaintiffs have suffered damages in an amount to be determined at trial, plus interest at the maximum legal rate.

## THIRD CAUSE OF ACTION

### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

80.     Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

81.     Plaintiffs contract with PayPal also contained an implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing required that PayPal not take any action that would have the effect of injuring the rights of Plaintiffs to receive the benefits of the contract.

82.     PayPal breached the implied covenant of good faith and fair dealing by improperly terminating Plaintiffs' account for violation of its Acceptable Use Policy without reason to believe that Plaintiffs engaged in activities or conduct forbidden by the Acceptable Use Policy.

83.     PayPal also breached the implied covenant of good faith and fair dealing by improperly and pretextually terminating Plaintiffs' accounts for violation of the Acceptable Use Policy in order to provide an economic advantage to Plaintiffs' competitors.

1

## **FOURTH CAUSE OF ACTION**

2

### **(FRAUD)**

3     84.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

4     85.    Defendant made a number of misrepresentations to plaintiff concerning both the

5 reasons for the termination of Plaintiffs' PayPal accounts and Defendant's willingness to work

6 with Plaintiff to resolve the supposed violations of PayPal's Acceptable Use policy so that

7 Plaintiff could maintain a PayPal account. PayPal represented that it terminated Plaintiff's PayPal

8 account because Plaintiff's service violated PayPal's Acceptable Use policy. Defendant also

9 represented that the sexual nature of Plaintiffs' websites violated PayPal's acceptable use policy.

10 In addition, a number of different PayPal employees and representatives indicated that the alleged

11 violations of its policies could be resolved such that Plaintiff could continue to hold a PayPal

12 account. These statements were false when made. Plaintiffs' accounts were not terminated

13 because of any violation of PayPal's acceptable use policy, but because PayPal wanted to bestow

14 an unfair competitive advantage on Plaintiffs' competitors by processing payments for them.

15 Despite the statements of its representatives, PayPal had no intention of resolving its issues or

16 allowing Plaintiffs to maintain PayPal accounts under any circumstance.

17     86.    Defendant made these misrepresentations and omissions of material fact with the

18 intention of causing Plaintiff to rely thereon and: a) continue to use PayPal during the period when

19 PayPal representatives pretended to attempt to "resolve" the suspension of Plaintiffs' accounts; b)

20 prevent and discourage Plaintiff from contesting or initiating litigation or other adjudicative

21 process regarding the termination of Plaintiffs' accounts; and c) conceal the real reasons for

22 Defendant's termination of Plaintiff's account and Defendant's true economic relationship with

23 the Competitor websites.

24     87.    Plaintiffs did in fact rely on Defendants' misrepresentations and Plaintiffs' reliance

25 was justifiable and reasonable under the circumstances.

26     88.    As a direct and proximate result of Defendant's fraud, Plaintiff has suffered actual

27 damages in an amount no less than $20,000 to be proven at trial.

28

1       89.     Defendant's fraud and deceit as set forth above was committed through oppression,

2 fraud and malice with intent to cause injury to Plaintiff through willful and conscious disregard of

3 Defendant's promises and Plaintiffs rights, thereby subjecting Plaintiff to cruel and unjust

4 hardship in conscious disregard of their rights, and/or deprive it of property and legal right through

5 misrepresentation, deceit and concealment of material facts. Therefore, Plaintiffs are entitled to an

6 award of exemplary and punitive damages under California Code of Civil Procedure Section 3294

7 in an amount to be proven at trial.

8 **FIFTH CAUSE OF ACTION**

9 **(UNFAIR BUSINESS PRACTICES)**

10 **(California Business and Professions Code § 17200 et seq.)**

11       90.     Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

12       91.     Any conduct that is unlawful, unfair or deceptive constitutes a violation of the

13 California Unfair Competition Law, Business and Professions Code § 17200 et seq. (the "UCL").

14       92.     Plaintiffs have standing to pursue this claim as Plaintiffs have suffered an injury in

15 fact and have lost money or property as a result of PayPal's actions. Plaintiffs paid money for

16 PayPal services based on the claims that PayPal provides for secure and immediate transfer of

17 funds to individuals and businesses in need of a payment processor. Plaintiffs also paid money for

18 PayPal services based on PayPal's public provision of services to the Competitor Websites (as

19 well as the Competitor websites' public and open advertisement of their affiliation with PayPal).

20 In reality, PayPal only provided its services selectively to certain businesses based on un-

21 announced and unpublished standards and rules that are, in fact, in direct conflict with the

22 standards and principles announced in PayPal's contracts with its customers. Defendant's actions

23 constitute deceptive business practices and a scheme of unfair competition with respect to

24 Defendant's processing services and contracts all of which Plaintiffs and members of the public

25 have a right to be protected against Defendant's fraud, deceit and unfair business competition.

26 Defendant has engaged, and continues to engage, in business acts that are unfair, deceptive, untrue

27 or misleading advertising with respect to the processing services they offered to provide, and did

28 provide for a time, to Plaintiffs.

93.     As a direct and proximate result of the conduct alleged herein, the damages and liability of Defendant, including past, present and future damages and losses, are substantial and in the millions of dollars and have not been fully ascertained.

94.     Defendants acted with oppression and malice in doing the acts and omissions alleged herein, and acted in conscious disregard of Plaintiffs' rights, and a as a result are liable for punitive and exemplary damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.     For actual and consequential damages to be proven at trial;

2.     For treble damages available for anticompetitive behavior;

3.     For declaratory and injunctive relief.

4.     For costs of suit;

5.     For attorney's fees as permitted by law;

6.     For pre- and post-judgment interest at the legal rate;

7.     For restitution, in an amount to be proven at trial;

8.     For punitive and exemplary damages; and

9.     For such other and further relief that this Court deems proper.


DATED: April 26, 2012                          BAKER MARQUART LLP



                                               By: _____
                                                   Mark L. Smith
                                                   Attorneys for Plaintiffs